IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

ISP TECHNOLOGIES, INC.

    Plaintiff,

v.                      CIVIL NO.: WDQ-11-0023

CAPRICORN PHARMA, INC.,

    Defendant.

MEMORANDUM OPINION

ISP Technologies, Inc., ("ISP") sued Capricorn Pharma, Inc., ("CPI") for breach of contract and related claims. For the following reasons, CPI's motion to dismiss will be granted in part, and denied in part. ISP's motion for partial summary judgment will be denied.

I.   Background[1]

ISP is a Texas corporation that develops, manufactures and supplies "innovative specialty ingredients" for pharmaceutical products. Compl. ¶¶ 1-2. CPI is a Maryland corporation that develops and manufactures "specialty oral drug delivery systems" and pharmaceutical products. *Id.* ¶ 2.

---

[1] For the motion to dismiss, the well-pled allegations in ISP's complaint are accepted as true. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). On summary judgment, CPI's evidence "is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On October 29, 2003, ISP and CPI entered in an "Alliance Agreement" to "work together on an exclusive basis to develop, commercialize, and sell certain pharmaceutical products and to share equally in the profits derived from those sales." *Id.* ¶ 6. The Alliance Agreement stated:

> Whereas, CPI possesses certain Technology,[2] . . . ISP possesses customer contacts in the Fields[3] [and] marketing, sales and distribution capabilities necessary to market and sell Products[4] throughout the world; and whereas CPI and ISP mutually (a) desire to work together on an exclusive basis, worldwide, to develop Products . . . and (b) wish to establish terms for, among other things, the development, commercialization and sale of Products for use in the Fields, and equally share in the profits to be derived from the sale of Products . . . CPI and ISP agree as follows . . . The purpose of the Alliance is to develop, commercialize and sell Products . . . The initial focus of the Alliance shall be to develop and to achieve a global leadership position with respect to Products in the Fields . . . CPI and ISP shall form a Leadership Team [to] meet at least four times per calendar year and implement and administer the Alliance, as well as decide which Projects[5] shall be undertaken.

---

[2] "Technology" meant CPI's "process and ingredient technologies related to microencapsulation for use in . . . taste masking and/or stability improvement in orally ingested solids, and . . . flavor/active delivery and/or stability improvements for use in oral care products for humans." Compl., Ex. 1 at 3.

[3] "Fields" included "over-the-counter pharmaceuticals" and "oral care products for toothpaste, mouthwash, and denture adhesive." Compl., Ex. 1 at 2.

[4] "Products" were "microencapsulated ingredients . . . intended for sale to the Fields." Compl., Ex. 1 at 2.

[5] "Projects" meant the "collaborative work . . . conducted after [formation of the Alliance Agreement] by CPI to develop technology and manufacturing capability and [by] ISP to market and sell products for sale to the Fields." Compl. Ex. 1 at 3.

Compl., Ex. 1. at 1-5.

The parties agreed that the Leadership Team would follow a three-step process to approve proposed Products before either party took "any action whatsoever with respect to the [proposed Product] on its own behalf or with, or on behalf of, any third party." *Id.* at 4. For 12 years, CPI would "use its commercially reasonable efforts to supply ISP with all of [its] requirements of Products and ISP [would] use its commercially reasonable efforts to market, sell and distribute Products." *Id.* at 5.

The Alliance Agreement allowed the parties to "engag[e] in activities with any third party" if "such activity by either party d[id] not interfere with, or detract from that party's ability to meet its [Alliance Agreement] obligations." *Id.* at 6. If either party engaged in Product sales outside the Alliance, it was required to "pay [the] other party a commission equal to 50% of the profits from [the sales]." *Id.* at 8. With proper written notice, either party could audit the other "to verify (a) the accuracy of the other party's costs . . . and (b) the commissions payable." *Id.* at 9. The parties also agreed to "take all such actions as the other party may reasonably request to effect the terms of th[e] Agreement." *Id.* at 29.

The Alliance Agreement contained a choice of law clause specifying that Delaware law would govern its "validity,

interpretation and enforcement." *Id.* at 27. It also contained a dispute resolution clause:

> The parties agree to make a diligent, good faith attempt to resolve all disputes that arise from or relate to this Agreement or the breach thereof by negotiation . . . Either party may, upon written notice to the other, call an initial meeting to resolve any such dispute, such initial meeting to be held at the principal office of the party to which such notice is provided at a time mutually agreeable to the parties . . . If, within 30 days after the date of the initial written notice from one party to the other requesting negotiation, the parties remain unable to resolve such a dispute, either party may . . . submit such dispute to final and binding arbitration.

*Id.* at 27-28.

Pursuant to the Alliance Agreement, ISP advanced CPI $1,000,000 "in the form of a non-refundable license fee of $750,000 and a $250,000 contribution toward Capricorn's research and development costs." Compl. ¶ 7.

The parties also entered into a Loan Agreement and Security Agreement on October 29, 2003. *Id.* ¶ 14. Under the Loan Agreement, ISP loaned CPI "the principal sum of $1,000,000 to acquire, install, and service certain equipment for its business." *Id.* In return, CPI "promised to repay ISP the principal sum of $1,000,000 and interest . . . on or before October 29, 2010." *Id.* ¶¶ 15-17 & Ex. 3 at 1. The parties agreed that CPI would be in default under the Loan Agreement if it failed to make any principal or interest payment "within thirty (30) days of the date on which such payment [was] due."

*Id.*, Ex. 3 at 11. Under the Security Agreement, CPI "provided ISP a first priority security interest in certain receivables, equipment, and proceeds" related to Product development to secure CPI's payment under the Loan Agreement. Compl. ¶ 16; *id.*, Ex. 3 at 29.

ISP alleges that CPI made "several representations" to "induc[e]" it to enter into the Agreements, including: (1) "that it possessed certain process and ingredient technologies related to microencapsulation," (2) "that certain products . . . had been developed based upon its process and ingredient technologies," and (3) "that the money to be provided by ISP to CPI pursuant to the Alliance Agreement and the Loan Agreement . . . was needed to commercialize the aforementioned products and scale-up [CPI's] manufacturing and production capabilities." Compl. ¶ 8.

According to S. Rao Cherukuri, CPI's president, CPI entered into the agreements based on ISP's misrepresentations about its marketing capabilities and intentions, and after the agreements were made ISP "ceased *all* efforts to market, sell and distribute Products." S. Rao Cherukuri Decl. ¶¶ 2-4, 7 (emphasis in original). Cherukuri states that in December 2004, Larry Grenner, an ISP senior vice president, told him that "profit margins on the Products were low" and did not "meet ISP's business and financial goals." *Id.* ¶ 7. In June 2007, another

5

ISP senior vice president told Cherukuri that "ISP had lost interest in the Alliance Agreement." Id.

On July 7, 2008, Timothy Bee, ISP's senior director of global business, sent CPI a letter stating that it had defaulted on the Alliance Agreement. Id. ¶ 10; Compl. Ex. 2. The letter explained that CPI was in default because:

> In inducing ISP to enter into the Alliance Agreement (as well as the Loan Agreement of the same date), CPI misrepresented to ISP that (i) it possessed certain Technology, (ii) Products had been developed based upon the Technology and (iii) the money to be provided to CPI pursuant to the Alliance Agreement and the Loan Agreement was needed to commercialize the Products (and, specifically, to scale-up Capricorn's production capabilities).

Compl., Ex. 2. CPI had also "s[old] microencapsulated Products within the Field," but did not "pay . . . ISP the commission due" under the Alliance Agreement. Id. ISP has further alleged that CPI breached the Alliance Agreement because after ISP audited CPI's facilities and identified "corrective actions . . . for the potential production of encapsulated dextromethorphan, encapsulated glucosamine, and encapsulated caffeine," ISP failed to implement those changes. Compl. ¶ 10. ISP "requested, pursuant to . . . the Alliance Agreement, [to] meet[] with CPI within ten (10) days to resolve the disputes." Compl. ¶ 11. The parties met on July 28, 2008 but "ultimately failed to resolve the disputes." Id. ¶¶ 11-12.

On November 15, 2010, Gregg Kam, ISP's chief financial officer, wrote to CPI that "the outstanding principal amount of

the loans made pursuant to the Loan Agreement, together with accrued but unpaid interest thereunder, was due on October 29, 2010." Compl., Ex. 4. Kam's letter advised that ISP would "pursue any and all legal remedies available . . . if [CPI] fail[ed] to make payment in full by November 29, 2010." Id. CPI failed to pay.[6] See Compl., Ex. 5.

On January 5, 2011, ISP sued CPI for breach of the Alliance Agreement and Loan Agreement, intentional misrepresentation, negligent misrepresentation, and replevin. ECF No. 1. On February 4, 2011, CPI moved to dismiss the breach of the Alliance Agreement and misrepresentation claims. ECF No. 9. On February 18, 2011, ISP moved for partial summary judgment. ECF No. 11.

II. Analysis

    A. Standards of Review

        1. Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of

---

[6] Cherukuri states that CPI had used ISP's investment to "purchase[], install[], and validate[] the equipment [needed] to fulfill [its] obligations under the Alliance Agreement." Cherukuri Decl. ¶ 5. CPI also "invested a substantial amount of its own resources" to fulfill the Alliance Agreement, but ISP abandoned its obligations and prevented CPI "from making any profits." Id. ¶¶ 7-10. ISP then attempted to use the amount it claimed was due under the Loan Agreement to obtain assignment of "valuable patents" owned by CPI. Id. ¶ 11.

a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Midgal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001). Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced. *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003). These facts must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)(quoting *Twombly*, 550 U.S. at 557). The complaint must not only allege but also "show" that the plaintiff is entitled to relief. *Id.* at 1950. "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotation marks omitted).

2. Motion for Summary Judgment

Under Rule 56(a), summary judgment "shall [be] grant[ed] . . . if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering the motion, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [its] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but it also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citation and internal quotation marks omitted).

B. CPI's Motion to Dismiss

1. Breach of the Alliance Agreement

Count I is a breach of contract claim based on CPI's alleged failure to carry out the Alliance Agreement. CPI argues that Count I should be dismissed because ISP's allegations are

"bare conclusory allegations that do not meet the minimum pleading standards." Def.'s Mot. to Dismiss 8-9. ISP contends that it has sufficiently alleged several breaches of the Alliance Agreement. Pl.'s Opp'n Mot. to Dismiss 8-11.

Under Delaware law,[7] a breach of contract claim requires (1) a contract, (2) the breach of an obligation imposed by the contract, and (3) resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The parties dispute whether ISP's allegations are sufficient to show a breach.

ISP has alleged several theories of CPI's breach. For example, ISP has alleged that CPI "fail[ed] to respond completely and adequately to the corrective actions that ISP had identified in its plant audit for the potential production of encapsulated dextromethorphan, encapsulated glucosamine, and encapsulated caffeine," and that CPI sold "microencapsulated products contemplated by the Alliance Agreement but fail[ed] to pay ISP the commissions due." Compl. ¶ 25. The Alliance Agreement specifically required that the parties "not compete with the Alliance" by conducting "business involving a Product"

---

[7] In a diversity case, the choice of law rules are those of the state in which the district court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). Under Maryland choice of law rules, "parties to a contract may agree as to the law which will govern their transaction." *Taylor v. Lotus Dev. Corp.*, 906 F. Supp. 290, 294 (D. Md. 1995). Here, the Alliance Agreement specifies that Delaware law governs. Compl., Ex. 1 at 27.

unless that party paid the other "a commission equal to 50% of the profits from said business." *Id.*, Ex. 1 at 8. It also required each party to "take all such actions as the other party may reasonably request to effect the terms of th[e] Agreement." *Id.* at 29.

ISP's allegations are sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Count I will not be dismissed because ISP has sufficiently alleged breach of contract.

CPI also argues that Count I should be dismissed because ISP has "not allege[d] that it followed the dispute resolution procedures mandated by the Alliance Agreement." Def.'s Mot. to Dismiss 8-9. ISP contends that the dispute resolution procedures were not mandatory. Pl.'s Opp'n Mot. to Dismiss 10.

To recover damages, a plaintiff alleging breach of contract must demonstrate its substantial compliance with the provisions of the contract. *VLIW Tech.*, 840 A.2d at 612. Delaware courts interpret contractual provisions under the "objective theory"; contract terms are given the interpretation than an objective, reasonable third-party would assign them. *See Rhone-Poulenc Basic Chem. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992). When terms are unambiguous, they are given their plain meaning. *Id.* "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *Id.* Rather, "a contract is ambiguous only when

the provisions in controversy are reasonably or fairly susceptible to different interpretations." *Id.*

Here, the dispute resolution clause in the Alliance Agreement states that in a dispute, "[e]ither party *may*, upon written notice to the other, call an initial meeting to resolve . . . such dispute." Compl., Ex. 1 at 27 (emphasis added). If the initial meeting is unsuccessful, "either party *may* . . . submit such dispute to final and binding arbitration." *Id.* at 28 (emphasis added). This language is not "reasonably or fairly susceptible" to CPI's interpretation that the parties were required to submit disputes to binding arbitration. CPI's motion to dismiss will be denied as to Count I.

    2.   Intentional Misrepresentation

In Count III, ISP alleges that CPI made intentional misrepresentations to induce it to enter into the Alliance Agreement and Loan Agreement. CPI argues that Count III should be dismissed because it is not pled with particularity under Rule 9(b), and because no facts show ISP's reliance on the misrepresentations. Def.'s Mot. to Dismiss 12-15. ISP contends that its allegations satisfy Rule 9(b).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud shall be stated with particularity." Fed. R. Civ. P. (9)(b). A claim for intentional misrepresentation is within Rule 9(b)'s heightened pleading standard, *Baltimore Cnty. v. Cigna*

12

*Healthcare*, 238 Fed. Appx. 914, 925 (4th Cir. 2007), and is subject to dismissal if it "fails to specifically allege the time, place and nature of the fraud," *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 980 (4th Cir. 1990).

A claim for intentional misrepresentation requires ISP to allege that CPI: (1) deliberately concealed or overtly misrepresented a material fact, (2) acted with scienter, (3) intended to produce ISP's reliance on the misrepresented fact, (4) caused ISP to act in reliance, and (5) caused damage to ISP. *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

ISP's allegations sufficiently state a claim for intentional misrepresentation and satisfy Rule 9(b). ISP has alleged the time and place of the misrepresentations, which occurred "[d]uring the negotiations of the Alliance Agreement and the Loan Agreement." Compl. ¶ 36.[8] It has alleged the nature and content of the misrepresentation: CPI misrepresented "that it possessed . . . process and ingredient technologies related to microencapsulation" and that it had developed products "based upon [those] technologies." *Id.* ¶ 8. CPI also misrepresented that ISP's money "was needed to commercialize the aforementioned products and scale-up . . . manufacturing and

---

[8] *Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 738-39 (E.D. Va. 2010) (Rule 9(b) does not require "the exact date and time of each . . . misrepresentation," and may be satisfied when the plaintiff "named the entity, though not the specific person, making the misrepresentations").

13

production capabilities" of those products. *Id.* ISP has alleged that CPI knew the representations were false, and "willfully and knowingly withheld this [falsity] from ISP" to "induce ISP to enter into the Alliance Agreement and Loan Agreement." *Id.* ¶ 39.[9] Because of the representations, ISP "enter[ed] into the Alliance and Loan Agreements" on October 29, 2003, and "provide[d] $2,000,000 in advancements and loans to [CPI]." *Id.* ¶¶ 41-42.[10]

These facts are sufficient to inform CPI "of the particular circumstances for which [it] will have to prepare a defense at trial" and show "substantial pre-discovery evidence" of the facts supporting the alleged fraud. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). The motion to dismiss will be denied as to Count III.

### 3. Negligent Misrepresentation

CPI argues that Count IV, which states a claim for negligent misrepresentation, must be dismissed under the "economic loss rule." Def.'s Mot. to Dismiss 15-16. ISP argues that the economic loss rule does not apply outside of products liability cases. Pl.'s Opp'n 18.

---

[9] "Malice, intent, knowledge, and other conditions of a person's mind may be pled generally." Fed. R. Civ. P. 9(b).

[10] *See Mizell v. Sara Lee Corp.*, 2005 WL 1668056, at *6 (E.D. Va. 2005)(reliance should be pled with particularity, including allegations of the "who, what, when, where, and how").

14

To state a claim for negligent misrepresentation, ISP must allege that: (1) CPI had a duty to provide accurate information, (2) CPI supplied false information, (3) CPI failed to exercise reasonable care in obtaining or communicating the information, and (4) a loss to ISP caused by its justifiable reliance upon the false information. *Penn. Emp. Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 3d 458, 485-86 (D. Del. 2010).

As first developed, the economic loss doctrine "prohibit[ed] recovery in tort whe[n] a product ha[d] damaged only itself (*i.e.*, ha[d] not caused personal injury or damage to *other* property) and, the only losses suffered [were] economic in nature." *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1195 (Del. 1992). Although the rule is "rooted in products liability law, [it] has been expanded to other contexts." *Penn. Mut. Life Ins. Co. v. Norma Espinosa 2007-1 Ins. Trust*, 2011 WL 710970, at *3 (D. Del. Feb. 22, 2011). When applicable, it precludes a party from recovering in tort for purely economic losses, which include "any monetary losses, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of goodwill, and diminution in value." *Christiana Marine Serv. Corp. v. Texaco Fuel & Marine Mktg.*, 2002 WL 1335360, at *5 (Del. Super. June 13, 2002).

Under the economic loss rule, "a claim of negligent misrepresentation is only appropriate whe[n] the complaint alleges noneconomic losses such as personal injury or damage to

property that is not the subject of the underlying claim." *Snowstorm Acquisition Corp. v. Tecumseh Prods. Co.*, 739 F. Supp. 2d 686, 720 (D. Del. 2010). The rule is "especially suited to cases where privity of contract . . . exist[s]" because "[i]n such cases, it is presumed that the parties to the transaction have allocated the risk" through the bargaining process, *Danforth*, 608 A.2d at 1200, and there is "no reason to extend tort law into [an] area[] that can be adequately governed by contract law," *Brasby v. Morris*, 2007 WL 949485, at *7 (Del. Super. Mar. 29, 2007).[11]

Count VI alleges that "[d]uring the negotiations of the Alliance Agreement and the Loan Agreement," CPI "failed to exercise reasonable care in providing accurate information to ISP" and "ISP justifiably relied on [CPI's] representations." Compl. ¶¶ 44, 47-50. As a result, ISP "sustained damages" of the "$2,000,000 in advancements and loans to Capricorn." *Id.* ¶¶ 50-51. The claim plainly alleges only economic losses, *i.e.*, $2,000,000 in "monetary losses," and that the parties were in

---

[11] The economic loss doctrine does not apply to fraud or intentional misrepresentation claims that "go directly to the inducement of the contract, rather than its performance." *Brasby*, 2007 WL 949485 at *7. Thus, the doctrine does not bar ISP's intentional misrepresentation claim because that claim arises, not from CPI's performance of the Alliance Agreement, but from the misrepresentations CPI allegedly made to induce ISP into the Agreement. *See id.; Werwinski v. Ford Motor Co.*, 286 F.3d 661, 676 (3d. Cir. 2002)(recognizing a "limited exception" to the economic loss doctrine for certain fraud claims).

contractual privity. The claim is barred by the economic loss rule and will be dismissed.[12]

C. ISP's Motion for Partial Summary Judgment

Count II of the complaint states a claim for breach of contract based on CPI's failure to perform under the Loan Agreement. ISP seeks summary judgment on Count II because "it is undisputed that [CPI] breached the Loan Agreement by defaulting on its payment obligations to ISP." Pl.'s Mot. Partial Summ. J. 2. CPI argues that summary judgment should be denied because there has been no discovery and there are genuine disputes about the enforceability of the Loan Agreement, including whether ISP fraudulently induced CPI's agreement. Def.'s Opp'n Mot. Partial Summ. J. 12.

Under Delaware law, fraudulent inducement is an affirmative defense to a breach of contract action. *See Corkscrew Mining Ventures, Ltd. v. Preferred Real Estate Invs., Inc.*, 2011 WL 704470, at *4 (Del. Chan. Feb. 28, 2011). Like ISP's claim for intentional misrepresentation, the defense of fraudulent inducement requires CPI to show that (1) ISP made a false representation, (2) with knowledge that the representation was false, and the intent to induce CPI's action with the falsity, and (3) CPI justifiably relied on the representation. *Id.*

---

[12] *See Brasby*, 2007 WL 949485 at *6-7 (economic loss rule precluded negligence claim when the parties were in contractual privity and the losses alleged were purely economic).

(citing *Walker v. Res. Dev. Co.*, 791 A.2d 799, 814 (Del. Ch. 2000)).

CPI has submitted Cherukuri's declaration which supports its argument that there may be valid defenses to enforcement of the Loan Agreement, and explains the discovery CPI needs to adequately defend itself.[13] "[S]ufficient time for discovery is considered especially important when the relevant facts are exclusively in the control of the opposing party." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 246-47 (4th Cir. 2002). Here, the facts that CPI seeks to discover are in ISP's control.[14] Further, "summary judgment prior to discovery can be particularly inappropriate when a case involves complex factual questions about intent and motive," such as ISP and CPI's competing claims of fraud. *Id.* at 247. Based on these considerations, the Court will deny CPI's motion for partial summary judgment without prejudice.

---

[13] For example, Cherukuri states that CPI entered into the agreements based on ISP's misrepresentations of its marketing capabilities and intentions, and after the parties executed the agreements, ISP prevented CPI from profiting under them and attempted to extract patent rights from CPI. Cherukuri Decl. ¶¶ 5-11.

[14] Cherukuri states that discovery is needed about "ISP's planned marketing strategy for [Alliance] Products," "ISP's actual requirements for Products," "ISP's customer contacts, marketing, sales and distribution capabilities . . . as of 2003" and "ISP's motivation [for] its expressed desire to own [CPI's] patents." *Id.* ¶ 12.

III. Conclusion

For the reasons stated above, CPI's motion to dismiss will be granted in part, and denied in part. ISP's motion for partial summary will be denied.

_6/27/11_
Date

_/s/_
William D. Quarles, Jr.
United States District Judge